IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ST. MARYS AREA WATER AUTHORITY, :
       Plaintiff
                           :

       vs.               :   CIVIL NO. 1:CV-04-1593

ST. PAUL FIRE & MARINE      :
INSURANCE COMPANY,
       Defendant        :


*M E M O R A N D U M*

I.    *Introduction.*

       Plaintiff, St. Mary's Area Water Authority, filed this suit for breach of contract, alleging that defendant, St. Paul Fire & Marine Insurance Co., improperly refused to provide coverage for property losses the Authority sustained after chlorine gas escaped from a "pigtail pipe" at Plaintiff's water treatment facility.

       We are considering the parties' cross-motions for summary judgment. The plaintiff Authority argues it is entitled to reimbursement for the losses under an endorsement in Defendant's policy providing coverage for "mechanical breakdown." Conversely, Defendant maintains there was no mechanical breakdown in the pigtail pipe within the meaning of the policy and that in any event coverage is not available because of five exclusions in the policy for contamination, pollution, latent defect (in the pigtail), defects or errors (in the manufacture of the pigtail), and corrosion. In turn, the

Authority argues that the exclusions for pollution, corrosion and defects (either latent or in the manufacture of the pigtail) do not apply because of an exception in those exclusions for an explosion, maintaining that the escape of the gas was an explosion.  The Authority also argues that the mechanical breakdown coverage would be illusory if Defendant was allowed to invoke the exclusions for corrosion and defects (as well as for wear and tear, another exclusion in the policy) and in those circumstances Pennsylvania courts would require Defendant to provide coverage for mechanical breakdown regardless of the exclusions.

We apply the well-established standard to the parties' cross motions.  "Summary judgment can only be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Cetel v. Kirwan Financial Group, Inc.*, 460 F.3d 494, 506 (3d Cir. 2006)(quoting Fed. R. Civ. P. 56(c)).

II.   *Background*.

A.   *The Water Treatment Facility and the Escape of Chlorine Gas*.

For this section of the background, we borrow in a quoting fashion from both parties' statements of material facts

submitted in connection with their summary-judgment motions where the statements are undisputed.

The Authority is a municipal authority in Elk County, Pennsylvania.  It operates a water treatment plant, reservoir, and distribution system that supplies drinking water to the city of St. Mary's and the adjacent Fox Township.  The facility is a conventional water treatment system.  Drawing water from the reservoir, it performs sedimentation, clarification, filtration, and disinfection functions.  The Laurel Run Water Treatment Plant (the "Plant") is the central monitoring and treatment location for the facility, and it controls the facility's system of remote pumping stations and water storage tanks.

The Plant has a chlorinator which injects the water with chlorine.  At regulated intervals, the chlorinator draws chlorine from one of two one-ton cylinders, transports the chlorine through a system of pipes, and injects the chlorine, in precise amounts, into the water.  Between each one-ton cylinder and the rigid piping that flows into the water supply is a short, flexible pipe known, due to its appearance, as a "pigtail pipe."  The chlorine in the cylinders and pigtails is under pressure.

When Larry Ginther, the Authority's production foreman, arrived on the morning of July 9, 2003, he saw and smelled

chlorine gas from approximately "half a mile up the road" from the Plant.   Ginther quickly surveyed the Plant and then contacted the fire department.   Dwight Hoare, the Authority's manager, observed a greenish haze from two to three football fields away from the Plant. (Doc. 56, part 2, Pl.'s Ex. C, Hoare Dep., pp. 68-69).   Bob Bauer arrived as part of the Elk County HAZMAT team.   He received instructions from Ginther regarding the location of the chlorine room, and he and other members of the team then proceeded to shut off the valve at the chlorine cylinder to stop the discharge of chlorine.

It was determined that between 10:00 p.m. on July 8, 2003, and 6:00 a.m. on July 9, 2003, there had been an uncontrolled release of approximately 140 pounds of chlorine gas from the pressurized chlorinator system.   The location of the uncontrolled release of chlorine gas was in the pigtail pipe attached to the one-ton cylinder that was away from the interior wall of the chlorine room.   Bauer heard the whistling noise of chlorine escaping from the pigtail before shutting off the valve.

The chlorine gas was in a pressurized state while contained within the pigtail.   As the chlorine released through the rupture, the gas pressure decreased from tank pressure to atmospheric pressure.   The rapid volumetric expansion of the chlorine gas from a pressurized gaseous state to atmospheric pressure as it escaped from the ruptured tube created the

4

whistling noise.  The release point or rupture in the pigtail was at the coupling nearest to the tank adjacent to the braze joint where the copper tubing enters the coupling.  The initial break in the pigtail as observed on the morning of July 9, 2003, was approximately 1/8 inch.  It was also described as a pinhole.

When dry chlorine gas mixes with moisture, it becomes corrosive.  Reaction of moisture and dry chlorine gas forms hydrochloric and hypochlorous acids.  Hydrochloric acid corrodes and etches metal.  The cloud of hydrochloric and hypochlorous acids resulting from the escape of the chlorine expanded throughout the plant, settled on equipment in the facility, and caused damage.  (Doc. 77, Def.'s Statement of Material Facts, ¶¶ 6-8, 11).  It was specifically described as having a corrosive effect on the equipment with which it came in contact.  (Doc. 76, part 17, Def.'s Ex. O at p. 1-1).  One of Plaintiff's experts, Joseph Crosson, P.E., testified that any mixture of chlorine gas and moisture in the atmosphere would be a contaminant.  (Doc. 76, part 11, Def.'s Ex. I, Crosson Dep., pp. 160-61).

Crosson and Plaintiff's other expert, Dr. Richard Roberts, opined "that the sudden chlorine release at the St. Mary's Area Water Authorities Laurel Run Water Treatment Plant was a mechanical failure due to a defect [in the pigtail pipe] in the vicinity of the point at which the copper tubing enters the bronze coupling." (Doc. 56, part 4, Pl.'s Ex. H., experts'

report, p. 5)(brackets added).  They further stated: "The defect could have been in the copper tubing itself or in the brazed joint.  Over time, the effects of gas pressure, temperature and the specific nature of the defect reached a point where the pigtail could no longer contain the chlorine pressure and a sudden release of chlorine occurred." (*Id.*, pp. 4-5).  When deposed, Roberts testified that "it would be difficult to know" that such a defect was present.  (Doc. 76, part 12, Pl.'s Ex. J, Roberts Dep., p. 368).  Crosson testified that in his opinion, this was a "latent defect." (Doc. 76, part 11, Pl.'s Ex. I, Crosson Dep., p. 239).

Additionally, Crosson testified that external corrosion could have led to the hole in the pigtail, but only as a result of "a defective brazed joint." (*Id.*, pp. 233-34).  Under this theory, if the joint was defective by having a tiny gap in the flux that created a seal with the copper pigtail pipe, chlorine gas could have escaped from this hole and over time, combining with moisture in the air, corroded the pipe from the outside.  (*Id.*, pp. 232-33).  He also testified there was evidence of this imperfect sealing, (*id.*, pp. 234-35), and that this theory was as likely as any other defect in the pipe at that point and nowhere else.  (*Id.*, p. 235).

In the opinion of Defendant's expert, David Bizzak, "the proximate cause of the chlorine leak . . . was a failure of the flexible copper pigtail that occurred as a result of

internal corrosion precipitated by contamination.
Contamination, in the form of moist air that entered the pigtail
during change over of the chlorine cylinder, led to the
formation of corrosive acids that attacked the inner wall of the
pigtail, thinning the wall over time to such an extent that the
weakened wall failed, allowing an uncontrolled release of
chlorine." (Doc. 76, part 16, Pl.'s Ex. N, p. 8).

        George Dickover, St. Paul's Regional General Adjuster,
testified that a mechanical breakdown or a mechanical failure
required the presence of a moving part. (Doc. 76, part 20,
Def.'s Ex. R, Dickover Dep., p. 60). Similarly, Bizzak
testified that, based on his experience in evaluating piping
systems, he did not consider the failure of a pigtail pipe to be
a "mechanical failure," (doc. 76, part 21, Def.'s Ex. S, Bizzak
Dep., p. 66), that he considered a mechanical part to be
"mechanisms [like] valves, pumps, check valves," not "a piece of
piping." (Doc. 76, part 21, Def.'s Ex. T, Bizzak Dep., p. 85).

    B.  *The Policy Provisions.*

        The policy is an all-risk policy, "protect[ing]
covered property against risks of direct physical loss or damage
except as indicated in the Exclusions." (Doc. 56, part 2, St.
Paul's insurance policy, record at 60a). The policy originally
excluded coverage for mechanical breakdown, but the Authority
later purchased an endorsement for equipment breakdown which

extended coverage to mechanical breakdown.  The endorsement provides:

> **Equipment Breakdown Coverage**
>
> We'll cover direct physical loss or damage that results from an accident to covered equipment.
>
> *Accident* means direct physical loss or damage that results from:
>
> • mechanical breakdown or failure;
> • derangement of mechanical parts;
> • rupture caused by centrifugal force;
>
> . . . .
>
> • loss to a steam boiler, steam pipe, steam turbine or steam engine when the loss is caused by any condition or event within such equipment;
>
> . . . .
>
> *Covered equipment* is that portion of your covered property which:
> • is built to operate under vacuum or pressure, other than weight of contents; or
> • generates, transmits or utilizes energy.

(*Id.*, record at 45a).

> The equipment breakdown endorsement also provides:
>
> **Pollution Cleanup and Removal**
>
> We'll pay for additional expenses you incur for:
>
> • cleanup;
> • repair or replacement; or
> • disposal
> of covered property which is damaged, contaminated or polluted by pollutants as defined in your property protection.
> . . . .

8

But we won't pay any more than the limit for
pollution cleanup and removal shown in the
Equipment Breakdown Coverage Summary.

(*Id.*, record at 46a).  The limit for pollution cleanup and

removal shown in the Equipment Breakdown Coverage Summary is

$250,000.  (*Id.*, record at 44a).

The Equipment Breakdown Endorsement provides that the

policy exclusions still apply except for four of them:

**Exclusions - Losses We Won't Cover**

. . . .

**Property exclusions.** All of the exclusions
in your Property Protection, Business
Income, Blanket Earnings And Expenses or
other identified time element coverage forms
apply to the Equipment Breakdown Coverage
provided by this endorsement except:

• Boilers;
• Electrical damage;
• Electrical equipment; and
• Mechanical breakdown.

(*Id.*, record at 47a).

The relevant policy exclusions are found under the

heading "**Exclusions - Losses We Won't Cover**" and the exclusion

section specifies that the word "loss" in an exclusion also

means "damage."  (*Id.*, record at 68a).  The exclusions are as

follows.

**Contamination.**  We won't cover loss caused
by or resulting from any kind of
contamination of your covered products or
covered property.

If a loss not otherwise excluded results,
we'll pay for that resulting loss.

9

(*Id.*, record at 69a).

> **Defects or errors.**  We won't cover loss
> caused by or resulting from:
>
> • defects or errors in the materials,
> design, development, distribution,
> processing, manufacturing, workmanship,
> testing, installation, alteration, or repair
> of covered property;
>
> . . . .
>
> If a loss not otherwise excluded results,
> we'll pay for that resulting loss.

(*Id.*, record at 69a).

> **Pollution.**  We won't cover loss that is
> caused by or results from pollution unless
> the pollution is caused by or results from
> any of the following covered causes of loss:
>
> . . . .
>
> • explosion;
>
> . . . .
>
> *Pollution* means the actual, alleged, or
> threatened discharge, dispersal, release,
> leakage, seepage, migration, or escape of
> pollutants.
>
> . . . .
>
> *Pollutants* mean any solid, liquid, gaseous
> or thermal irritant, or contaminant
> including:
>
> • smoke, vapors, soot, fumes;
> • acids, alkalis, chemicals; and
> • waste or waste pollutants.
>
>  . . . .
>
> This exclusion applies regardless of any
> other cause or event that contributes
> concurrently or in sequence to the loss.

(*Id.*, record at 71a-72a).

> **Wear, tear, deterioration, animals.** We won't
> cover loss caused by or resulting from:
>
> • wear and tear;
> • deterioration, mold, wet or dry rot, rust,
> or corrosion;
>
> . . .
>
> • the inherent nature of the property.
>
> *Inherent nature* means a latent defect or any
> quality in the property that causes it to
> deteriorate or destroy itself.
>
> If loss from fire, smoke, lightning, wind,
> hail, explosion, vehicles, aircraft,
> vandalism, malicious mischief, civil
> disturbance, riot, leakage from fire
> extinguishing equipment, sinkhole collapse,
> volcanic action, building glass breakage,
> falling objects, weight of ice, snow, or
> sleet or water damage results, we'll pay for
> that resulting loss.

(*Id.*, record at 73a).

III.  *Discussion.*

    A.  *Whether There Is Coverage Under the
       Equipment Endorsement for Mechanical
       Breakdown Here.*

We start with whether Plaintiff's loss is covered by

the equipment breakdown endorsement.  Under Pennsylvania law,

"[t]he burden is on the insured to establish coverage under an

insurance policy." *Nationwide Mut. Ins. Co. v. Cosenza*, 258

F.3d 197, 206 (3d Cir. 2001) (citing *Erie Ins. Exch. v.

Transamerica Ins. Co.*, 516 Pa. 574, 580, 533 A.2d 1363, 1366

11

(1987)).[1]  The task of interpreting the policy is generally one
for the court rather than the jury.  *401 Fourth Street, Inc. v.
Investors Ins. Group*, 583 Pa. 445, 454, 879 A.2d 166, 171
(2005).  "The purpose of that task is to ascertain the intent of
the parties as manifested by the terms used in the written
insurance policy."  *Id.*, 879 A.2d at 171 (citations omitted).
"When the language of the policy is clear and unambiguous, a
court is required to give effect to that language," but "[w]hen
a provision in a policy is ambiguous, . . . the policy is to be
construed in favor of the insured to further the contract's
prime purpose of indemnification and against the insurer, as the
insurer drafts the policy, and controls coverage."  *Id.* at 455,
879 A.2d at 171 (citations omitted).

        In this case, the Authority argues that the equipment
breakdown endorsement covers the losses from the escape of
chlorine at the Plant.  The endorsement extends coverage to
"direct physical loss or damage that results from an accident to
covered equipment."  The endorsement defines "accident" as
"direct physical loss or damage that results from" "mechanical
breakdown or failure."  The policy does not define the phrase
"mechanical breakdown or failure" so Plaintiff relies on the
dictionary definitions of each of the words in the phrase.
"Mechanical" is

---

        [1]  Both parties have assumed Pennsylvania law controls but
have cited cases from other jurisdictions when they bear on the
issue involved.

defined to include: "of or relating to machinery or tools"; "relating to, governed by or in accordance with the principal of mechanics." (Doc. 56, part 5, Pl.'s Ex. N, record at 125a, citing Merriam-Webster Online Dictionary).  The definition of "breakdown" includes "the action or result of breaking down: as a failure to function." (*Id.*, record at 127a, citing Merriam-Webster Online Dictionary).  "Failure" is defined to include "a fracturing or giving way under stress [structural failure]." (*Id.*, record at 129a, citing Merriam-Webster Online Dictionary).

In light of the foregoing, Plaintiff maintains that the damages that occurred from the escape of chlorine gas on July 8 and 9, 2003, at the Plant are covered by the endorsement. Even if they disagree as to the cause, all of the experts attribute the escape of the gas to a failure in the wall of the pigtail pipe, a mechanical breakdown, in Plaintiff's view.  In turn, the failure in the pipe caused the damage to the covered equipment as the chlorine gas escaped.

Plaintiff also cites *Ready Food Prod., Inc. v. Great Northern Ins. Co.*, 417 Pa. Super. 643, 612 A.2d 1385 (1992), where the Pennsylvania Superior Court held that losses caused by corrosion of metal plates in a heat exchanger used in a dairy business were covered by a policy providing coverage for "mechanical breakdown."  In that case, the plates, used to lower the temperature of dairy products after pasteurization, had developed leaks when they had been pitted by corrosion, thereby

13

allowing bacterial contamination of the dairy products.  *Id.* at

644-45, 612 A.2d at 1386.  On appeal, the superior court

affirmed the trial court's ruling that this was a mechanical

breakdown of the heat exchanger, allowing the plaintiff to

recover under the policy for its losses.  In doing so, the

superior court decided that the phrase was ambiguous and that

the trial court's definition of "mechanical breakdown" was

reasonable.  That definition was as follows:

> [A]ny situation where a machine fails to
> function correctly, not merely one in which
> it has ceased functioning completely. . . .
> A reasonable mind might, thus believe, that
> the heat exchanger unit suffered a
> "mechanical breakdown" when, by reason of
> the holes resulting from corrosion, it
> admitted contaminated water into the dairy
> product.

*Id.* at 647, 612 A.2d at 1387.  The similarity to the instant

case is obvious.  Just as in *Ready Food*, when corrosion caused

holes to develop in the plates, corrosion that caused thinning

of the pigtail pipe can also be said to be a mechanical

breakdown.

However, the defendant insurer asserts that mechanical

breakdown or failure must include a breakdown or failure of

moving parts, and the pigtail pipe was stationary, not moving.

St. Paul relies on *Nat'l Investors Fire & Cas. Co. v. Preddy*,

451 S.W.2d 457 (Ark. 1970), and cases that cite *Preddy* for the

moving-parts requirement: *Am. Graphics, Inc. v. Travelers Indem.*

*Co.*, 17 Fed. Appx. 787, 791-92 (10th Cir. 2001)

(nonprecedential); *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F. Supp. 164, 196-97 (D. Conn. 1984); *Lake Charles Harbor & Terminal Dist. v. Imperial Cas. & Indem. Co.*, 670 F. Supp. 189, 192 (W.D. La. 1987), *aff'd*, 857 F.2d 286 (5th Cir. 1988); and *Connie's Constr. Co. v. Cont'l W. Ins. Co.*, 227 N.W.2d 204, 207 (Iowa 1975). As stated in *Preddy*: "We interpret a mechanical breakdown here to have reference to a failure in the working mechanism of the machinery -- a functional defect in the moving parts of the equipment which causes the latter to cease functioning or to function improperly. Actually, that is the very common usage of the term." 451 S.W.2d at 458.

Defendant distinguishes *Ready Food, supra*, because that case went to trial and it was the trial court's finding that a mechanical breakdown had occurred, while here the Authority is moving for summary judgment and the facts show, as supported by the deposition testimony of St. Paul's regional general adjuster and its defense expert, that a mechanical breakdown or a mechanical failure requires the presence of a moving part. The adjuster testified specifically to that, and the defense expert testified that pipes could not be part of a mechanical failure. St. Paul also argues that *Ready Food* "has not been followed, and represents a minority view," as shown by the cases Defendant has cited that have rejected the broad interpretation of mechanical breakdown accepted in *Ready Food*. (Doc. 73, Def.'s Br. in Opp'n at p. 18).

We do not believe the weight of authority is that "mechanical breakdown or failure" requires the failure of moving parts.  Review of the cases Defendant cites shows that the absence of moving parts was dispositive only in *Preddy* itself and *Standard Structural Steel.*  In *Lake Charles*, the exclusion for mechanical breakdown was not applied, not because no moving part was involved, but because testimony convinced the court that the exclusion did not apply to "catastrophic" losses for the insured.  670 F. Supp. at 193-94.  In *Connie's Constr. Co.*, the exclusion for mechanical breakdown was not applied, not because no moving part was involved, but because mechanical breakdown was not the cause of the loss; the plaintiff's employees caused the loss by placing too much cable on the crane.  237 N.W.2d at 206.  In *American Graphics*, the court actually used the "ordinary meaning" of mechanical breakdown, the dictionary definition, which did not include a moving-parts element.  17 Fed. Appx. at 791, 793.[2]

In this regard, as quoted above, while *Preddy* does include such an element for its definition of mechanical breakdown, the case does not indicate its source for that requirement; it simply announces it as the "common usage."  451

---

[2]  Parenthetically, the damage in this case was not caused by an object falling into the moving parts of a printing press, as Defendant asserts, but by a loose bolt inside the press entering the gear path.  17 Fed. Appx. at 792, 793.

S.W.2d at 458.[3]  Pennsylvania courts also look to "common usage" when terms are not defined in the insurance policy, *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 608, 735 A.2d 100, 108 (1999), but they have adopted the practice of looking to the dictionary definition of the words or phrases to assist in interpreting the policy.  *Id.; Gen. Refractories Co. v. Ins. Co. of N. Am.*, 906 A.2d 610, 612 (Pa. Super. 2006); *TIG Specialty Ins. Co. v. Koken*, 855 A.2d 900, 910 (Pa. Commw. 2004).[4]

As noted, the policy does not define the phrase "mechanical breakdown or failure," but Plaintiff has supplied the Merriam-Webster Online definitions of each of the words in the phrase.  "Mechanical" is defined as "of or relating to machinery or tools"; "relating to, governed by or in accordance with the principal of mechanics."  "Breakdown" is defined as "the action or result of breaking down: as a failure to function."  "Failure" is defined as "a fracturing or giving way under stress [structural failure]."

None of these definitions includes moving parts as an element.  We therefore disagree with the defendant insurer and

---

[3]  The court also applied the rule that policies should be construed in favor of the insured and against the insurer as the draftsman.  *Id.*

[4]  It is therefore irrelevant that Defendant's adjuster and expert think "mechanical" involves moving parts.  *Id.*, 855 A.2d at 908 (the court "should focus on what the agreement itself expressed and not on what the parties may have silently intended").

conclude that the failure of a moving part is not necessary for coverage under the mechanical breakdown endorsement. *See Ready Food, supra; see also City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 45 (2d Cir. 2003)(under Vermont law the phrase "mechanical breakdown" is ambiguous so that it includes the failure of welds on a boiler); *American Graphics, supra*, 17 Fed. Appx. at 793 (under the "ordinary meaning" of "mechanical breakdown" in the dictionary, mechanical breakdown exclusion precluded coverage when a printing press "quit running when a loose object entered the gear path from inside the machine"); *Soil Remediation v. Eclipse Combustion*, 1995 WL 590176 at *5 and n.5 and n.6 (E.D. Pa.)(the phrase "mechanical breakdown" is not ambiguous and an exclusion for mechanical breakdown precluded coverage for an explosion caused by defective gas valves under the dictionary definitions of "mechanical" and "breakdown," with the latter defined as "the action or result of breaking down . . . as a failure to function").

Further, using these definitions to define the meaning of the phrase "mechanical breakdown or failure" means that there is coverage under the endorsement for what happened to the pigtail pipe.  The pipe is mechanical because it is part of the machinery at the Plant or at least connected to the machinery. A breakdown occurred because the pipe failed to function when it developed a hole that allowed chlorine gas to escape.  A failure

also occurred because the pipe gave way under the stress of the chlorine gas.

We thus decide that the mechanical breakdown endorsement provides coverage.  We turn now to whether any of the exclusions preclude coverage.

B.  *The Exclusions*.

As noted above, the endorsement provides that it is subject to certain exclusions.  Defendant argues that coverage is not available because of five exclusions in the policy for contamination, pollution, latent defect (in the pigtail), defects or errors (in the manufacture of the pigtail), and corrosion.  Two of the exclusion clauses, captioned, "Pollution" and "Wear, tear, deterioration, animals" (the latter clause excludes corrosion and latent defect) have an exception for losses caused by an explosion.  The Authority argues that the escape of the gas was an explosion, and hence Defendant cannot rely on exclusions for pollution, corrosion and latent, or manufacturing, defect.[5]

The insurer has the burden of establishing that an exclusion precludes coverage, *Madison Const. Co., supra,* 557 Pa. at 605, 735 A.2d at 106, but the insured has the burden of establishing an exception that allows coverage.  *N. Ins. Co. v.*

---

[5]   The manufacturing-defect exclusion appears in a separate exclusion clause, captioned "Defects or errors," which has no explosion exception, but as will be seen below, that has no bearing on our disposition of this argument.

*Aardvark Assocs.*, 942 F.2d 189, 194-95 (3d Cir. 1991).  We first address Plaintiff's argument based on the exception for an explosion.

> 1. *The Escape of the Chlorine Gas Was*
>    *Not an Explosion and Is Not Excepted*
>    *From the "Pollution" and "Wear, Tear,*
>    *Deterioration, Animals" Exclusions.*

The Authority argues that the escape of gas from the pigtail pipe was an explosion.  As support for this position, Plaintiff first looks to the dictionary definition of "explosion."  (The policy does not define "explosion".) "Explosion" is defined in part as: "an act of exploding: a violent expansion or bursting that is accompanied by noise and is caused by a sudden release of energy . . . from an escape of gases or vapors under pressure (as in a steam boiler)." Webster's Third New International Dictionary (1993 edition).

The Authority also cites case law.  In *Weisman v. Green Tree Ins. Co.*, 447 Pa. Super. 549, 552-53, 670 A.2d 160, 161-62 (1996), the Pennsylvania Superior Court, in relying on the dictionary definition in finding that a shotgun blast could constitute an explosion, defined "explosion" as "'a violent bursting or expansion, with noise,'" adding that the bursting was the result of internal energy from the shotgun.  The court also cited *Allen v. Ins. Co. of N. Am.,* 175 Pa. Super. 281, 283, 104 A.2d 191, 193 (1954), which held that the term "explosion"

must be taken in its ordinary sense, i.e., as "a violent
bursting or expansion, with noise."

Plaintiff also cites *Am. Alliance Ins. Co. v. Keleket
X-Ray Corp.*, 248 F.2d 920 (6th Cir. 1957), where the defendant
insurers provided coverage against loss because of explosion.
The plaintiff company used a small radium capsule (about fifteen
millimeters in length and four millimeters in diameter) to
calibrate "pocket dosimeters" on a "calibration stand."  A plug-
type cap sealed the radium in the capsule.  The cap was under
pressure varying from ninety-eight to 440 pounds per square
inch.  One time while the capsule was in use, the cap came off
the capsule with a "pop," releasing a white mist of radioactive
powder and radon gas through the vent holes of the calibration
stand that contaminated the plaintiff's plant.

The Sixth Circuit upheld a jury determination that an
explosion had occurred.  The court first noted that the policies
protected "against losses resulting from explosions of both
large and small magnitude, the latter being nonetheless
explosions despite their relatively small release of energy."
248 F.2d at 923.  The court then concluded:

> we think the jury was justified in inferring
> that the pressures were sufficient to, and
> did, cause an explosion.  The popping noise
> and simultaneous appearance of a cloud of
> white powder or mist at the vent holes of
> the stand also substantiate the verdict.

248 F.2d at 924.  The court also noted that under Ohio law the
meaning of explosion varied with the circumstances, *id.* at 925,

21

so that an explosion had still occurred even when there had been "no 'sudden and rapid combustion,' no 'violent expansion of the air' (on a large scale), and no 'report' as that word is commonly used." *Id.*

Plaintiff also relies on *Lakeshore Marine, Inc. v. Hartford Accident & Indem. Co.*, 296 S.E.2d 418 (Ga. Ct. App. 1982), where a witness characterized an escape of chlorine gas from a tank through a faulty valve as an explosion by noting that "a chlorine tank, a full chlorine tank of this type, at an ambient temperature of eighty degrees Fahrenheit, will have a gas pressure of 100 PSI. So, this would cause a very sudden explosion of gas from the system." *Id.* at 421.

Based on the foregoing, Plaintiff argues that an explosion occurred here, consisting of a "sudden failure of the pigtail on the pressurized chlorinator system resulting in the uncontrolled noisy release of chlorine gas." (Doc. 80, Pl.'s Opp'n Br. at p. 24). In support, Plaintiff notes two facts. First, both sides' experts agree that internal pressure caused the failure of the pipe wall, resulting in an uncontrolled release of chlorine. Second, the sudden chlorine release was noisy because Bob Bauer, a member of the Elk County HAZMAT team, reported a  whistling noise when he shut off the valve.

Plaintiff's conclusion is that these undisputed facts establish an explosion because they meet the definition of "explosion" in Webster's Third International Dictionary as "a

violent expansion or bursting that is accompanied by noise and is caused by a sudden release of energy . . . from an escape of gases or vapors under pressure (as in a steam boiler)."

In opposition, St. Paul argues that Plaintiff has not shown that an explosion occurred.  First, both the dictionary definition and *Weisman, supra*, require violence, but no violence occurred because the pigtail did not break apart; it merely developed a small hole about one-eighth of an inch in diameter, also described as a "small pinhole." *See also Oroville Cordell Fruit Growers, Inc. v. Minneapolis Fire & Marine Ins. Co.*, 411 P.2d 873, 877 (Wash. 1966)(even if pressure of ammonia gas caused hairline crack in pipe, expressing doubt that there was sufficient violence for an explosion).  Second, there was no "violent expansion or bursting"; the evidence only establishes that the gas simply escaped from the small hole.  Third, there is no evidence of a loud noise, only a whistling noise, like air escaping a balloon.  Fourth, there was no sudden release of energy; the whistling noise "probably" went on for "a couple of hours" as the gas slowly leaked out.  Fifth, "[t]he distinguishing characteristic of an explosion is the detonation." *Fox v. Nationwide Ins. Co.*, 1988 U.S. Dist. LEXIS 14631, at *7-8 (E.D. Pa.)(quoting *Allen v. Ins. Co. of N. Am.*, 175 Pa. Super. 281, 284, 104 A.2d 191, 193 (1954)), and here there was no detonation.  Finally, "[t]he term 'explosion' is also 'to be construed in its popular sense, and as understood by

ordinary men, and not by scientific men,'" *Fox*, 1988 U.S. Dist. LEXIS 14631, at *8 (quoting *Fifteen Twenty-Six, Inc. v. Am. Eagle Fire Ins. Co.*, 21 Pa. D. & C. 2d 583, 586 (Phila. Ct. Com. Pl. 1959)), and the ordinary person would not consider the escape of chlorine gas an explosion because neither the pigtail nor the surrounding property was destroyed.

We agree with the defendant insurer that no explosion occurred here.  Plaintiff argues for an explosion on the basis that there was a "sudden failure of the pigtail on the pressurized chlorinator system resulting in the uncontrolled noisy release of chlorine gas."  (Doc. 80, Pl.'s Opp'n Br. at p. 24).  However, this omits the requirement of "a violent expansion or bursting," and as Defendant points out, the evidence only establishes that the gas simply escaped from the small hole; there is no evidence of a violent expansion or bursting.  Also, there is no evidence of a loud noise, only a whistling noise, like air escaping a balloon.  Further, there was no sudden release of energy; the gas slowly leaked out of the pigtail.  We thus conclude that the uncontrolled, yet gradual, release of chlorine gas from a small hole is not an explosion within the ordinary meaning of the word.

Plaintiff's reliance on *Lakeshore Marine, Inc. v. Hartford Accident and Indem. Co.*, 296 S.E.2d 418 (Ga. App. 1982), *Pioneer Chlor Alkali Co., Inc. v. Royal Indem. Co.*, 879 S.W.2d 920, 935-37 (Tex. App. 1994), and *Keleket X-Ray Corp.*,

24

*supra*, is misplaced.  The Authority cites *Lakeshore Marine* as a case where the court held that escape of chlorine gas from a valve constituted an explosion.  However, in that case it was an expert, not the court, who characterized the escape as an explosion, 296 S.E.2d at 421, and the case did not deal with whether the escape was caused by mechanical breakdown or failure but whether the escape was an "accident" covered under the policy, which unlike here, was defined as "a sudden and accidental breakdown of [an] Object" covered under the policy. *Id.* at 422.  *Pioneer Chlor Alkali* is similarly distinguishable because it also dealt with an "accident" defined in the policy as "a sudden and accidental breakdown of an Object" and with an ambiguity created by an exclusion for corrosion.  879 S.W.2d at 937-38.  *Keleket X-Ray Corp.* is distinguishable because the cap of the capsule blew off so that unlike here a violent expansion or bursting had occurred, albeit a miniature one.

Based on the foregoing, we conclude that Plaintiff cannot invoke the explosion exception in the two exclusion clauses, captioned, "Pollution" and "Wear, tear, deterioration, animals," the latter clause excluding corrosion and latent defect.

We turn next to Plaintiff's argument that the exclusions for wear and tear, corrosion and defect (either latent or manufactured) cannot be invoked here because they would render mechanical breakdown coverage illusory.

   2.   *There Mechanical Breakdown Coverage
        Applies Because Otherwise Coverage
        Would Be Illusory.*

Citing *401 Fourth Street, Inc. v. Investors Ins. Group*, 583 Pa. 445, 879 A.2d 166 (2005), Plaintiff argues that the exclusions for wear and tear, corrosion and defect (either latent or manufactured) cannot be invoked here because they would render the mechanical breakdown coverage illusory.  The Authority asserts that mechanical breakdown does not happen unless there has been wear and tear, corrosion or some form of defect in the equipment.  If the exclusions were enforced, the mechanical breakdown coverage really provides no coverage at all since the exclusions cover every possible way mechanical breakdown occurs.

In *401 Fourth Street, Inc., supra*, the Pennsylvania Supreme Court recognized that insurance coverage could be illusory and implied that it would not enforce exclusions that took away coverage the policy provided.  In that case, the court was determining the scope of coverage for a policy endorsement that provided coverage for "loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building."  *Id.* at 450, 879 A.2d at 169.  The court ruled that this language provided coverage not just for the falling down of a building, but also for the "imminent falling down of a building or part thereof."  *Id.* at 460, 879 A.2d at 174.

The case involved a parapet wall that had become bowed, or bulging.  The endorsement excluded from the meaning of "collapse" "settling, cracking, shrinkage, bulging or expansion."  *Id.* at 451, 879 A.2d at 169.  In issuing its ruling, the supreme court also held:

> [W]e also find that the exclusion from the definition of the term "collapse" for "bulging" does not compel summary judgment in favor of Investors Insurance.  Although an insurance contract may state that a collapse did not include settling, cracking, shrinking, bulging, or expansion, it is difficult to imagine a collapse that would not include some of these attributes.  Thus, the term "collapse" can reasonably be interpreted as not including minor settling, cracking, or bulging, but includes settling, cracking, or bulging that result in the collapse or, pursuant to the language of the policy provision at issue here, immediate collapse, of the structure.  Indeed, coverage under the policy language at issue *sub judice* would be illusory and contrary to the intent of the parties if bulging was part of an imminent collapse and yet this condition was excluded from coverage. *Accord American Concept Ins. Co.* [*v. Jones*, 935 F. Supp. 1220, 1277-28 (D. Utah 1996)].

*Id.* at 460 n.3, 879 A.2d at 174 n.3.  Plaintiff argues that the situation here is analogous, that an endorsement providing coverage for mechanical breakdown is illusory if every condition that would bring about a mechanical breakdown is excluded from coverage.

In opposition, the defendant insurer argues that the Authority is improperly trying to read the exclusions out of the policy.  Citing *Rorer Group, Inc. v. Ins. Co. of N. Am.*, 440 Pa.

Super. 69, 72-73, 655 A.2d 123, 124-25 (1995), Defendant contends the policy must be read as a whole, with the mechanical breakdown coverage read together with the exclusions in the policy as it was originally issued.  Since these exclusions apply, Plaintiff is bound by them.

Defendant also points out that in *Rorer Group, Inc.* the Pennsylvania Superior Court rejected the plaintiff's argument that an endorsement expanding coverage under an all-risk policy would be a "nullity" if exclusions for defects and corrosion in the original policy were allowed to defeat the expanded coverage.  *Id.* at 74, 655 A.2d at 125.  The plaintiff had suffered losses caused by latent defects, corrosion and cracking in equipment used to manufacture the plaintiff's product, a human plasma derivative.  The endorsement extended coverage to cracking but left undisturbed the original policy's exclusion of coverage for losses "whether contributed to in whole or in part" by "latent defects" or "corrosion," among other excluded perils.  *Id.* at 71, 655 A.2d at 124.  Rejecting the plaintiff's argument that applying the exclusions in the original policy to the endorsement would nullify the endorsement, the court stated the endorsement still provided coverage for losses it expanded coverage to but which were unaffected by the exclusions in the original policy.  *Id.* at 73-74, 655 A.2d at 125.  The court concluded that "[i]n a case such as this, where the parties bargain at arms length, we cannot

28

read the Endorsement as completely erasing all of the exclusions clearly set out in the main policy." *Id.* at 74, 655 A.2d at 125 (footnote omitted).

Defendant also attempts to distinguish *401 Fourth Street, Inc., supra*, because the main issue there was the proper scope of policy language covering "loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building."

Further, in its reply brief on its own motion for summary judgment, Defendant argues specific examples of mechanical breakdown coverage supposedly unaffected by exclusions for wear and tear, defect and corrosion:

> There are many causes of mechanical breakdown that do not involve wear and tear, defect, or corrosion.  For the sake of argument, one could imagine various scenarios in which a mechanical breakdown could occur without involving wear and tear, defect or corrosion, for example: a fire; an explosion that damages a neighboring machine; an object being introduced into a mechanical system, thereby causing it to fail; or the misuse of a machine.

(Doc. 82, Def.'s Reply Br. at p. 6).

Contrary to Defendant's position, the court believes that *401 Fourth Street, Inc., supra*, does indicate that the Pennsylvania Supreme Court will apply the illusory-coverage rule.  The case cannot be distinguished simply because the main issue was the proper scope of policy language covering "loss or damage caused by or resulting from risks of direct physical loss

involving collapse of a building or any part of a building." A separate issue in the case was whether the exclusion from "collapse" for "bulging" meant that there was no coverage. The court clearly indicated that it would not simply interpret "collapse" as excluding "bulging" if it meant that coverage was defeated, doing so because "it is difficult to imagine a collapse that would not include some of these attributes," *id.* at 460 n.3, 879 A.2d at 174 n.3, meaning bulging, settling, cracking, shrinking and expansion. The court also directly stated that coverage would be "illusory and contrary to the intent of the parties if bulging was part of an imminent collapse and yet this condition was excluded from coverage." *Id.*, 879 A.2d at 174 n.3.

Thus, the Supreme Court of Pennsylvania has shown a willingness to refuse to enforce exclusions if the result is illusory coverage. This is not a novel approach. Other jurisdictions will do the same. *Posteli v. State*, 698 So.2d 618, 620 (Fla. App. 1997); *Schwartz v. State Farm Mut. Auto. Ins. Co.*, 174 F.3d 875, 879 (7th Cir. 1999)(Indiana law); *Monticello Ins. Co. v. Mike's Speedway Lounge, Inc.*, 949 F. Supp. 694, 703 (S.D. Ind. 1996)(Indiana law); *Lineberry v. State Farm Fire & Cas. Co.*, 885 F. Supp. 1095, 1099 (M.D. Tenn. 1995)(Tennessee law). The rationale often is that the conflict between the coverage language and the exclusion language creates an ambiguity that must be resolved in favor of the insured.

*Posteli*, 698 So.2d at 620; *Monticello Ins. Co.*, 949 F. Supp. at 702; *Lineberry*, 885 F. Supp. at 1099.  Pennsylvania has the same rule regarding ambiguity.  *401 Fourth Street, Inc., supra,* 583 Pa. at 455, 879 A.2d at 171 ("[w]hen a provision in a policy is ambiguous, . . . the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage") (citations omitted).

 *401 Fourth Street, Inc.* appears to be the only time the Pennsylvania Supreme Court has addressed illusory insurance coverage, and the case does not set forth any formal standard for evaluating when coverage is illusory.  We think Indiana law provides appropriate guidance.  In Indiana:

> An insurance provision is considered illusory if "a premium was paid for coverage which would not pay benefits under any reasonably expected set of circumstances." *Fidelity & Guaranty Ins. Underwriters, Inc. v. Everett I. Brown Co.,* 25 F.3d 484, 490 (7th Cir. 1994).  If a provision covers some risk reasonably anticipated by the parties, it is not illusory.  *See City of Lawrence v. Western World Ins. Co.,* 626 N.E.2d 477, 480 (Ind. App. 1993).  If it does not, the illusory provision should be enforced in a way that protects the insured's reasonable expectations.  *Id.*

*Schwartz, supra*, 174 F.3d at 879.  If there is coverage for at least one risk, it is not illusory.  *Id.*

 Here, Plaintiff appears to be correct that the mechanical breakdown coverage is illusory, given the exclusions

for wear and tear, defects and corrosion.[6]   Like Plaintiff, we
can conceive of no reasonably expected set of circumstances
where the mechanical breakdown coverage would apply if there was
no corrosion or defect, as defect is defined in the policy's
exclusions.   The exclusion for a "latent defect" (found in the
exclusion titled "Wear, tear, deterioration, animals") excludes
coverage for a "defect or any quality in the property that
causes it to deteriorate or destroy itself."   The exclusion for
a defect in manufacturing (found in the exclusion titled
"Defects or errors") excludes coverage not only for a defect in
the manufacture of covered property but also for "defects or
errors in the materials, design, development, distribution,
processing . . . workmanship, testing, installation, alteration,
or repair of covered property."   It is difficult to conceive of
how else a mechanical breakdown could occur.

        Defendant has argued specific examples of how this
could happen: a fire; an explosion that damages a neighboring
machine; an object being introduced into a mechanical system,
thereby causing it to fail; or the misuse of a machine.
However, as Plaintiff has pointed out, all of these events would
have as their proximate cause perils already covered under the

---

        [6]   In an all-risk policy, an exclusion for wear and tear
alone would not create illusory coverage since such a policy is
supposed to cover only fortuitous events.   *City of Burlington,
supra*, 332 F.3d at 47.

policy and are thus examples of those covered risks, not of coverage for mechanical breakdown.

In Pennsylvania, proximate cause is used to determine coverage under an insurance policy. *See Jefferson Bank v. Progressive Cas. Ins. Co.*, 965 F.2d 1274, 1281 (3d Cir. 1992) (citing *Marks v. Lumbermen's Ins. Co.*, 160 Pa. Super. 66, 49 A.2d 855 (1946)); *Tatalovich v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, 2003 WL 22844173, at *1 (Pa. Ct. Com. Pl.).[7]

Thus, if a fire caused the mechanical breakdown, then coverage is provided because fire is a covered peril under the policy.  So is an explosion.  Further, objects do not just fall into machines and damage them nor are machines misused without some cause.  It is most likely due to someone's negligence, and negligence is covered under the policy. *See Raybestos-Manhattan, Inc. v. Indus. Risk Insurers*, 289 Pa. Super. 479, 482-83, 433 A.2d 906, 908 (1981).

Defendant's reliance on *Rorer Group, Inc., supra,* is also misplaced.  Unlike the plaintiff in *Rorer*, the Authority does not argue here that the equipment breakdown endorsement has to be read separately from the exclusions in the original policy.  It accepts that the endorsement and the policy have to be read together, but argues that certain exclusions make the

_____

[7]  It is also, and perhaps more commonly, called "efficient proximate cause." *See United States Fid. & Guar. Co. v. Lehigh Valley Ice Arena, Inc.*, 2004 WL 741365, at *9 (E.D. Pa.); *Pioneer Chlor Alkali Co. v. Nat'l Union Fire Ins. Co.*, 863 F. Supp. 1226, 1232 (D. Nev. 1994)(applying Nevada law).

mechanical breakdown coverage illusory.  Additionally, it is true that the Pennsylvania Superior Court did reject the plaintiff's argument there that an endorsement expanding coverage would be a "nullity" if exclusions for defects and corrosion in the original policy were allowed to defeat the expanded coverage, but simply because the plaintiff in *Rorer* did not show coverage to be illusory there does not mean that coverage is not illusory here.

We agree with the Authority that the mechanical breakdown coverage is illusory.  We must therefore enforce that coverage in a way that protects the Authority's reasonable expectations.  *Schwartz, supra*, 174 F.3d at 879.  We think that it was reasonable for the Authority to have expected coverage in the  circumstances here.  An insured would have considered a pipe springing a leak a mechanical breakdown for which it had purchased coverage under the equipment breakdown endorsement. We have also already discussed above how the small hole in the pipe fits within the mechanical breakdown coverage, using the dictionary definitions to define the meaning of the phrase "mechanical breakdown or failure."  As noted, the pipe is mechanical because it is part of the machinery at the Plant or at least connected to the machinery.  A breakdown occurred because the pipe failed to function when it developed the hole that allowed chlorine gas to escape.  A failure also occurred because the pipe gave way under the stress of the chlorine gas.

3.   *The Contamination and Pollution Exclusions*.

Having decided that mechanical breakdown coverage is illusory, we now consider whether the contamination or pollution exclusions bar coverage, as Defendant argues.[8]

(a) *The Contamination Exclusion*.

The policy excludes coverage for "loss caused by or resulting from any kind of contamination of . . . covered property." The contamination exclusion also has an "ensuing" or "resulting" loss clause which provides: "If a loss not otherwise excluded results, we'll pay for that resulting loss." Defendant argues that the cloud of hydrochloric and hypochlorous acids resulting from the escape of the chlorine expanded throughout the plant, settled on equipment in the facility, and contaminated it within the meaning of the exclusion.

Defendant relies on *Graham v. Harleysville Ins. Co.*, 429 Pa. Super. 444, 450, 632 A.2d 939, 942 (1993), which principally used the dictionary definition of "contaminate" to hold that an exclusion from a homeowner's policy "with respect

---

[8]   It may be that these exclusions are not enforceable, given our conclusion that the mechanical breakdown coverage is illusory, *see Monticello Ins. Co., supra*, 949 F. Supp. at 703 (interpreting Indiana law so that exclusions that do not render coverage illusory cannot defeat coverage the insured reasonably expected), but we think the illusory-coverage rule should apply only to those exclusions that make the coverage illusory; the insurer should otherwise be able to rely on other exclusions the parties agreed to.

to losses caused by the 'release, discharge or dispersal of contaminants or pollutants,'" *id.* at 446, 632 A.2d at 940, barred recovery for losses caused by oil escaping from a neighbor's oil tank.  "Contaminate" was defined as "to render unfit for use by the introduction of unwholesome or undesirable elements . . . Contaminate implies an action by something external to an object which by entering into or coming in contact with the object destroys its purity."  *Id.* at 450, 632 A.2d at 942 (quoting Webster's Third New International Dictionary).  The defendant insurer argues Plaintiff's property was similarly rendered unfit for use by the introduction of chlorine gas, hydrochloric acid, and hypochlorous acid. Therefore, it has been contaminated within the meaning of the policy, and the contamination exclusion applies.

We reject Defendant's reliance on the contamination exclusion.  As the Authority argues, the proximate cause of the loss was not contamination but mechanical breakdown, a mechanical breakdown which the court accepts on this record as covered under the policy.  "[I]f a risk insured against was the proximate cause of a loss, the insured may recover even though a peril excluded from coverage may have contributed thereto." *Tatalovich v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, 2003 WL 22644173, at *1; see also *United States Fid. & Guar. Co., supra*, 2004 WL 741365, at *9.  The contamination exclusion therefore does not apply here.

(b) *The Pollution Exclusion*.

The policy excludes coverage for "loss that is caused by or results from pollution . . . ."  "Pollution" is defined as "the actual, alleged, or threatened discharge, dispersal, release, leakage, seepage, migration, or escape of pollutants. "'Pollutants'" mean any solid, liquid, gaseous or thermal irritant, or contaminant including . . . vapors, . . . fumes . . . acids [and] chemicals."  The pollution exclusion also provides: "This exclusion applies regardless of any other cause or event that contributes concurrently or in sequence to the loss."

Defendant argues that the pollution exclusion bars coverage because chlorine gas is a chemical that resulted in the creation of hydrochloric acid and hypochlorous acids that escaped or were discharged, dispersed, released, or migrated into the facility damaging the Authority's property.  *See Madison Const. Co., supra,* 557 Pa. at 608-10, 735 A.2d at 108-09.

The Authority argues against application of the pollution exclusion here because a "pollutant" is identified as a "contaminant," making the exclusion ambiguous because contamination is excluded in the separate exclusion specifically referring to contamination.  Because of this ambiguity, the test for proximate cause applicable to the contamination exclusion should govern, the test which favors the insured.  Hence, just

as with the contamination exclusion, the pollution exclusion does not apply because the cause of the Authority's losses was mechanical breakdown, not pollution.[9]

To begin with, we need not address this argument, at least as to $250,000, the limits of coverage for the equipment breakdown endorsement listed in the coverage summary for the equipment breakdown endorsement.  As Plaintiff points out, the equipment breakdown endorsement extends coverage to losses caused by pollution.  In relevant part, the endorsement provides:

> **Pollution Cleanup and Removal**
>
> We'll pay for additional expenses you incur for:
>
> • cleanup;
> • repair or replacement; or

---

[9]  The pollution exclusion has a different causation provision from the contamination exclusion.  The latter exclusion has an "ensuing loss" provision, allowing recovery for losses brought about by an uncovered risk as long as that risk was in the sequence of events proximately caused by a covered risk.  *See North Coast Enterprises v. St. Paul Fire & Marine Ins. Co.*, 2006 WL 851707, at *3 (W.D. Wash.).  The pollution exclusion provides: "This exclusion applies regardless of any other cause or event that contributes concurrently or in sequence to the loss."  This provision excludes coverage for losses occurring because of a combination of covered and uncovered risks, regardless of whether the covered risk caused the uncovered one.  *See Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, 2002 WL 31247972, at *6-7 (E.D. Pa.)(citing *Doylestown Elec. Supply Co. v. Maryland Cas. Ins. Co.*, 1996 U.S. Dist. LEXIS, 20599, at *13 (E.D. Pa.), and *Rorer Group, Inc., supra,* 440 Pa. Super. at 74 n.1, 655 A.2d at 125 n.1.  The effect of this concurrent-cause provision is to exclude coverage for losses caused by pollution even if the pollution was set in motion by mechanical breakdown brought on by a defect in the pipe.

> • disposal
> of covered property which is damaged,
> contaminated or polluted by pollutants as
> defined in your Property Protection.
> . . . .
>
> But we won't pay any more than the limit for
> pollution cleanup and removal shown in the
> Equipment Breakdown Coverage Summary.

(*Id.*, record at 46a).  This provision is comprehensive for pollution caused by mechanical breakdown, covering the cleanup, repair replacement and disposal of covered property.

For damages above $250,000, we agree with the Authority that the contamination and pollution exclusions create an ambiguity which must be resolved in Plaintiff's favor.  The escape of chlorine gas resulting in the cloud of hydrochloric and hypochlorous acids that settled on equipment throughout the Plant meets both the definition of "contamination" and "pollution."  As a contaminant, it rendered the covered property unfit for use by the introduction of unwholesome or undesirable elements by entering into or coming in contact with the covered property.  As a pollutant, it was a "discharge, dispersal, release, leakage, seepage, migration, or escape of a contaminant."  However, there is ambiguity as to coverage here because the contamination exclusion, through its "ensuing loss" clause, permits coverage of losses caused by contamination as long as the proximate cause of the contamination was a covered risk, but the pollution exclusion would bar coverage of losses caused by pollution (which includes contamination) through its

concurrent-cause provision which bars coverage for pollution even if the pollution was caused by the mechanical breakdown. *See Narricot Indus., Inc., supra*, 2002 WL 31247972, at *7 (no coverage under a policy using a concurrent-cause provision when a covered peril causes an uncovered one, both causing damage to the property). This ambiguity must be resolved in favor of coverage for the Authority. We therefore conclude that the pollution exclusion does not bar the coverage provided by the equipment breakdown endorsement.

      C.   *Plaintiff's Request that the Court establish The Amount of Damages Not in Dispute.*

      Pursuant to Fed. R. Civ. P. 56(d), Plaintiff has requested that the court rule that the following facts are not in controversy: (1) the Authority is entitled to the policy's coverage limit of $4,075,784 for losses resulting from the breakdown of the pigtail pipe and is not subject to the limits of the Additional Coverages in the Equipment Breakdown Endorsement for pollution and expediting expenses or any other lesser limits in the Additional Benefits Coverage Summary; and (2) the Authority reasonably incurred damages of at least $1,211,944, in making the necessary repairs to the Plant and is entitled to a partial judgment in that amount.

      Defendant does not dispute the first request, so we will include it in our order. The second request is based on a report made by the defendant insurer's damages expert, who

evaluated the invoices submitted by two of Plaintiff's contractors and inspected the repairs at the Plant. (Doc. 56, part 6, Pl.'s Ex. S). The expert excluded some repairs as unnecessary or as upgrades and essentially did not dispute $1,211,944 of the repairs.

Defendant opposes a finding that this amount is not at issue by arguing that its expert never concluded in his report that the repairs were reasonable and that Plaintiff has provided no evidence that it actually paid these invoices.

Upon review, the court believes that the expert did essentially find that the amount was reasonable, but we agree with Defendant that there is no evidence that the $1,211,944 was actually paid. Thus, we will deny this aspect of Plaintiff's request.

We will issue an appropriate order.


/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: October 27, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ST. MARYS AREA WATER AUTHORITY,  :
      Plaintiff

                             :

      vs.                :   CIVIL NO. 1:CV-04-1593

ST. PAUL FIRE & MARINE    :
INSURANCE COMPANY,
      Defendant         :

*O R D E R*

      AND NOW, this 27th day of October, 2006, it is ordered that:

      1.  The motion (doc. 75) of defendant, St. Paul Fire & Marine Insurance Co., for summary judgment is denied.

      2.  The motion (doc. 55) of Plaintiff, St. Mary's Area Water Authority, for summary judgment is granted as follows.

      3.  An interlocutory summary judgment is hereby entered in favor of Plaintiff and against Defendant on Defendant's liability to provide coverage under the mechanical breakdown endorsement for the losses caused by the breakdown of the pigtail pipe on July 8 and 9, 2003.

      4.  Coverage shall be up to the Policy limit of $4,075,784, subject to the $1,000 deductible.

      5.  If Plaintiff actually paid its contractors, the amount of damages not in controversy is at least $1,211,944.

      6.  The pretrial conference and trial (limited to damages) will proceed as scheduled on November 7, 2006, and November 13, 2006, respectively.

                    /s/William W. Caldwell
                  William W. Caldwell
                  United States District Judge